Luis Antonio MONTES, Petitioner-Appellant,

v.

Leo D. JENKINS, Warden, Indiana State Prison, Respondent-Appellee.

No. 79–1983.

United States Court of Appeals, Seventh Circuit.

Argued June 5, 1980.

Decided July 25, 1980.

Professor Charles F. Crutchfield and Richard Waris (Law Student), Notre Dame, Ind., for petitioner-appellant.

Kermit R. Hilles, Deputy Atty. Gen., Indianapolis, Ind., for respondent-appellee.

Before SPRECHER and BAUER, Circuit Judges, and CAMPBELL, Senior District Judge.*

---

* The Hon. William J. Campbell, Senior Judge of the United States District Court for the North-ern District of Illinois, Eastern Division, is sitting by designation.

BAUER, Circuit Judge.

This appeal from the district court's denial of petitioner Luis Antonio Montes' habeas corpus petition poses two issues: The first is whether Montes was denied his Sixth Amendment right to confront adverse witnesses in his state trial when the prosecution introduced the joint confession of Montes and his codefendant, and when the trial court did not, *sua sponte* give a limiting instruction stating that the confession of the codefendant could not be used as evidence of Montes' guilt; the second issue is whether Montes' confession was unconstitutionally used in evidence either because it was involuntary or because it was obtained as the result of Montes' allegedly illegal detention by police. The district court found no violation of Montes' constitutional rights. We affirm.

I.

This case arose out of the fatal beating of David Doty, the houseman at an Indiana Department of Corrections work release center located in a residential part of Indianapolis. Montes and his state trial codefendant John Farrar were on work release programs at the center when Doty's body was discovered shortly after 5:00 a. m. on March 13, 1973. After arriving at the scene, police briefly questioned Montes, Farrar, and the other thirteen work releasees; they then moved all fifteen to a local police station. Although suspicion had not focused on any of the fifteen when the questioning at the center was conducted, remarks made by Montes and by a fellow work releasee caused police to suspect Montes.[1] After reaching the station, and prior to further questioning, police advised Montes of his *Miranda* rights. Montes signed a form indicating that he waived those rights.

Beginning at about noon, police questioned Montes; he repeatedly denied involvement in the killing. He was given a lunch and was, it appears from the record, questioned by one or two officers at a time. Sometime during the afternoon, police asked him if he would be willing to take a polygraph examination. He was informed of the nature of the examination and agreed. Questioning of Montes resumed after the examination, and shortly thereafter, at about 5:00 p. m., police read to Montes the waiver of rights form he had earlier signed. Montes then confessed that he and Farrar had killed Doty. At about 6:00 p. m. Montes was formally arrested on the murder charge.

The interrogation of Farrar followed a similar pattern. Farrar was advised of his *Miranda* rights, executed a written waiver of rights form at about 4:00 p. m., was questioned, and denied any involvement in the killing. In response to a police request, Farrar agreed to take a polygraph examination. After the test, Farrar confessed that he and Montes had killed Doty.

At about 7:30 p. m., Montes and Farrar were brought together in a room with Police Detective Robert Hoke and Police Sergeant James Strode. Montes' confession was read to Farrar,[2] who stated several times during the reading that what Montes had said was true. Afterwards, Montes and Farrar were incarcerated for the night. Early the next morning they were taken before a magistrate and formally charged with Doty's murder.

1. Richard Radford, one of the work releasees, told police that he had seen Doty alive at 4:15 a. m. and that he had seen Montes awake at that time. Montes' initial statement to police was that Radford had seen him when he had come upstairs from his room to find out what time it was because he had no clock in his room. Police subsequently searched Montes' room and found a working clock.

2. The trial transcript indicates that Montes may have repeated his confession aloud to Farrar, *see* note 4 *infra*, but the state's brief to this Court indicates that the confession "was read aloud to both of them." The Indiana Supreme Court, in its direct review of Montes' conviction, appears to have taken the latter view of the record. *Montes v. State*, 263 Ind. 390, 393, 332 N.E.2d 786, 789 (1975). Whichever method was used, the material fact is that it was Montes' confession in Montes' words that was read to Farrar and that Farrar adopted.

Montes' confession and the fact that Farrar adopted it were introduced in their joint trial by Sergeant Strode's oral testimony. Farrar's independent confession was not introduced. The jury found Montes guilty of second degree murder and Farrar guilty of first degree murder. Both were sentenced to life imprisonment.

On appeal, the Indiana Supreme Court held, *inter alia*, that Montes' confession was neither involuntary nor the fruit of an illegal detention and that introduction of Farrar's adoption of Montes' confession did not violate Montes' confrontation rights. *Montes v. State*, 263 Ind. 390, 332 N.E.2d 786 (1975). Montes then filed this habeas corpus action. An earlier ruling by the district court denying Montes' petition was reversed by this Court and remanded for a review of the state court record and a determination of whether an evidentiary hearing was necessary. *Montes v. Jenkins*, 581 F.2d 609 (7th Cir. 1978). After examining the state court record, the district court again ruled against Montes, and this appeal followed.

## II.

As the district court recognized, Montes' contention that his confrontation rights were infringed must be considered in light of the recent decision in *Parker v. Randolph*, 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979). In *Parker*, a four-member plurality found that the rule against introduction of a nontestifying defendant's confession in a joint trial in which a codefendant has not confessed, *see Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), does not apply where the interlocking confessions of both defendants are introduced with the cautionary instruction that the confession of one defendant cannot be considered as evidence of the guilt of his codefendant. The plurality reasoned that when both codefendants have

confessed and both confessions are otherwise admissible in a joint trial, a limiting instruction is sufficient to cure any potential prejudice from introduction of the confessions or from an inability to cross-examine a codefendant concerning his confession. 442 U.S. at 74–75 & n. 7, 99 S.Ct. at 2139–40 & n.7, 60 L.Ed.2d 713 (plurality opinion).

Concurring in *Parker*, Justice Blackmun took the position that the *Bruton* prohibition is applicable to interlocking confessions, that admission of the confessions into evidence was therefore error, but that any error in the case had been harmless beyond a reasonable doubt. *Id.* at 76–82, 99 S.Ct. at 2141–43 (Blackmun, J., concurring). The three dissenting Justices agreed that *Bruton* and the harmless error rule were applicable, but disagreed concerning the ultimate conclusion that the error had been harmless. *Id.* at 80–83, 99 S.Ct. at 2143–44 (Stevens, J., joined by Brennan & Marshall, JJ., dissenting). The eight Justices who participated in *Parker* were, thus, evenly divided over which analytical approach to take to the interlocking confession situation.

We need not decide which of the two approaches in *Parker* should govern this case: under either approach, Montes' conviction was constitutionally sound. Accepting for present purposes the validity of the *Parker* plurality's approach, it was not error to admit the confessions into evidence. Accordingly, Montes' only complaint would be that the failure of the trial court to give a limiting instruction on its own motion rendered his conviction constitutionally infirm. We think, however, that Montes waived his right to a limiting instruction when he failed to request one. Although he argues to the contrary, the law at the time Montes was tried gave ample notice to his counsel that the joint confessions may have been admissible,[3] and that, in the event that they

---

3. Montes has argued that his trial counsel could not have been expected to foresee the Supreme Court's decision in *Parker*, and thus could not have been expected to request a limiting instruction. The very basis of *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20

L.Ed.2d 476 (1968), however, is that a limiting instruction is insufficient where introduction of a codefendant's confession in a joint trial may have a devastating effect on a nonconfessing codefendant's case. Given our decision in *United States v. Spinks*, 470 F.2d 64 (7th Cir.),

were, Montes' confrontation rights could be protected only by an instruction to the jury that Farrar's adoption of Montes' confession was not evidence of Montes' guilt. In the face of this and of the state prosecutor's statement during trial that he felt a limiting instruction would be proper, defense counsel failed to request one. Montes cannot be permitted to allow error into the record and then seek to overturn his conviction on the basis of his own inaction.

Even assuming Montes did not waive his right to a cautionary instruction, his failure to request one means that he must demonstrate, at the least, that he was prejudiced by the absence of a cautionary instruction. Only when a failure to instruct " 'constitutes basic and highly prejudicial error' " will relief be accorded a defendant who has not sought an instruction at trial. *United States v. Esquer*, 459 F.2d 431, 435 (7th Cir. 1972), *cert. denied*, 414 U.S. 1006, 94 S.Ct. 366, 38 L.Ed.2d 243 (1973) (quoting *Franano v. United States*, 310 F.2d 533, 539 (8th Cir. 1962), *cert. denied*, 373 U.S. 940, 83 S.Ct.

1545, 10 L.Ed.2d 694 (1963)). As the analysis of the harmless error issue that follows indicates, Montes has not demonstrated that he was prejudiced by the introduction of Farrar's adoption of his confession. *A fortiori*, he has not demonstrated that he was prejudiced by the absence of a limiting instruction with respect to that evidence. Under the *Parker* plurality's approach, Montes' constitutional rights were not infringed.

Assuming, alternatively, that the analytic approach of Justice Blackmun and the dissenters in *Parker* should control, the issue becomes whether introduction of Farrar's adoption of Montes' confession was harmless error beyond a reasonable doubt. Phrased otherwise, the issue is whether the introduction of Farrar's adoption of Montes' confession can reasonably be thought to have affected the jury's verdict as to Montes. We conclude that it cannot.

As Sergeant Strode's testimony regarding the confessions, which is summarized in the margin,[4] indicates, Montes gave a de-

---

cert. denied, 409 U.S. 1011, 93 S.Ct. 456, 34 L.Ed.2d 305 (1972), that interlocking confessions were not subject to the *Bruton* rule, Montes' counsel should have anticipated that introduction of Farrar's confession was not certain to be deemed error and should, therefore, have requested a limiting instruction.

4. Strode's testimony regarding the confession was, *in pertinent part, as follows:*

Q: What, if anything, did Montes say to you in the presence of Defendant Farrar?

\* \* \* \* \* \*

A: He stated that both were going to get the checkbook when Mr. Doty was asleep; stated Farrar went up—correction—went and asked Doty for the key, while Mr. Montes waited in the hall. Doty handed the key to Farrar. Farrar then hit in the face and knocked him out, so he could get the checkbook of Mr. Doty. Doty went down. He got back up, and Farrar hit Doty several more times.

\* \* \* \* \* \*

A: Stated that Farrar had hit Doty several more times. Doty then threatened to send both Montes and Farrar back to Pendleton. Farrar went to his room and got an iron bar. Came back, and struck Doty several more times.

\* \* \* \* \* \*

A: Prior to this, Montes stated that he went downstairs and got a towel, and held it to Mr. Doty's head.

\* \* \* \* \* \*

A: Stated that after Farrar hit Doty with the bar, Farrar gave the bar to Mr. Montes, who also struck Mr. Doty. He stated that Farrar took the money out of Doty's pocket. Farrar got the checkbook out of Mr. Doty's dresser. At this point, Mr. Montes heard a noise upstairs. Montes then got a sack, and both put the shoe—correction—shoes, money, checkbook and the gloves in the sack. At this point, Mr. Farrar opened the back door, and Mr. Farrar put the sack in the trash, and both went to bed after that.

\* \* \* \* \* \*

Q: What did Mr. Farrar say, and when? In the presence of Mr. Montes.

A: He said that what Mr. Montes said was— was the way it happened and true.

\* \* \* \* \* \*

Q: Which questions did Defendant Farrar answer?

A: I asked him several times during my conversation with Mr. Montes, if this was the way that it happened, and he said yes.

We note that Montes' counsel argued in oral argument before this Court that the confession included self-serving statements by Farrar that may have prejudiced Montes. We find no evidence of this; indeed, the case appears to be exactly the opposite.

tailed confession which Farrar heard and adopted; the substance and the wording of the confession were Montes'. No significant doubt was cast at trial on Montes' confession, and the jury had no reason to disbelieve it. In view of this, the fact that Farrar had agreed that it was true cannot reasonably be thought to have affected the jury's determination of Montes' guilt. Plainly the jury did not abandon an inclination to acquit Montes because Farrar had seconded Montes' own detailed confession.

Neither did Montes suffer from his inability to cross-examine Farrar about the confession. Montes could have gained little by attempting to demonstrate that Farrar had lied or been mistaken when he said that what Montes himself had said was true. Even assuming Montes might somehow have impeached or shaken Farrar's adoption of the confession, there still would have remained the problem of discrediting the author of the confession: Montes himself. *Cf. Parker v. Randolph, supra,* 442 U.S. at 72–74, 99 S.Ct. at 2139 (plurality opinion); *United States v. Spinks,* 470 F.2d 64, 66 (7th Cir.), *cert. denied,* 409 U.S. 1011, 93 S.Ct. 456, 34 L.Ed.2d 305 (1972). Montes did not take the stand at trial to repudiate his confession; neither did he demonstrate any fact or circumstance that seriously cast doubt on the veracity of that confession. Cross-examination of Farrar would have been of no help. As Justice Blackmun noted in *Parker,* the introduction of interlocking confessions usually will be harmless error, and any potential for harmful error will nearly always be attributable to differences between the two confessions. 442 U.S. 78–80, 99 S.Ct. at 2142 (Blackmun, J., concurring); *see also id.* at 84–87, 99 S.Ct. at 2145–46 (dissenting opinion). The confessions here were in substance identical. We have no difficulty concluding that introduction of Farrar's adoption of Montes' confession did not affect the verdict as to Montes

and was harmless error beyond a reasonable doubt.[5]

Thus, under either approach advocated in *Parker,* Montes' confrontation rights were not infringed.

### III.

■ Montes' second contention is that his confession was involuntary and that its introduction into evidence therefore violated due process. In resolving this issue we must consider all relevant facts and circumstances of record to determine whether Montes made the decision to confess of his own free will or was coerced into confession by police actions. *See, e. g., Blackburn v. Alabama,* 361 U.S. 199, 206–08, 80 S.Ct. 274, 279–280, 4 L.Ed.2d 242 (1960); *Fikes v. Alabama,* 352 U.S. 191, 197, 77 S.Ct. 281, 284, 1 L.Ed.2d 246 (1957). After reviewing the record, we conclude, as did the state trial court, the Indiana Supreme Court, and the district court, that police actions did not overbear Montes' will.

■ Montes' argument is, in substance, that the length of his interrogation, his education and background, the use of the polygraph examination, the failure to give more than two *Miranda* warnings, and the delay in bringing him before a magistrate all combined to render his confession involuntary. Taking these points in turn, Montes was not questioned for excessive periods of time; total questioning consumed less than eight hours. The record reveals little about Montes' background and education, but we note that he had previously been convicted of manslaughter and was not, therefore, inexperienced in dealing with police. Montes voluntarily agreed to take the polygraph examination after being told of its nature. Although he contends that he did not understand either the intricacies of the polygraph or the fact that his

---

5. Montes has argued to this Court that, in the event that we find prejudice to Montes to be a controlling factor in our decision, the case should be remanded to the district court for a hearing on whether prejudice occurred. Montes has not suggested, however, what evidence he might produce during such a hearing, and we can think of none that he might produce on the question. The state court record is plain; equally plain is the fact that it does not support the theory that Montes suffered prejudice from the introduction without limiting instruction of Farrar's adoption of the confession.

responses as measured by it were not admissible in court, the record does not indicate that police made any use of the results of the test in subsequent questioning of Montes. Montes had the opportunity at trial to present evidence showing that results of the test were improperly used to induce his confession; he produced no such evidence, and the presumption, therefore, is that nothing improper occurred. In addition, police are not required to give a technical explanation of the polygraph to persons who consent to take a polygraph test. Montes was given a simple explanation of how the device worked and does not now allege that he did not understand that explanation. Montes was also given *Miranda* warnings before interrogation and voluntarily submitted to questioning. He was reminded of his *Miranda* rights immediately before he confessed. Montes does not now allege that he ever requested to be allowed to consult with a lawyer or indicated to police that he did not wish to be questioned.[6] Nor was Montes detained unduly before being presented to a magistrate. He was questioned until about 8:00 p. m., after which time the record indicates that it would have been difficult if not impossible to bring him before a magistrate. He was brought before a magistrate early the next morning. Finally, we note that Montes was not interrogated in a hostile, threatening atmosphere. He was given food during the detention and apparently was questioned by only one or two officers at a time. As the district court noted, there is no evidence in the record of any coercion by police. We find Montes' confession to have been voluntary.

Montes' last contention is that police violated the Fourth Amendment when they took him from the work release center to the police station for questioning and that his confession should, therefore, have been excluded from evidence as fruit of an unconstitutional detention. Although the state has not so argued in its brief to this Court, the fact that Montes was given a full and fair opportunity to litigate his Fourth Amendment claim in state court precludes his assertion of it in this habeas corpus action. *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). Even if the issue were cognizable here, however, Montes would be entitled to no relief. At the time he was detained Montes was a convicted felon in the custody of the State of Indiana; he was not at liberty to go where he pleased. The only supervisor of the work release center to which he was assigned had been murdered. Under these circumstances, it was reasonable, indeed it was probably necessary, for police to take the work releasees to the police station until some arrangements for their continued custody could be made. As the detention did not violate the Fourth Amendment, the confession given during the course of the detention was not the result of an illegal detention and was not excludable at trial on that ground.

The judgment of the district court denying Montes' habeas corpus petition is

Affirmed.

---

6. In his memorandum in support of his habeas corpus petition filed in the district court, Montes alleged that, "[s]ome of the men asked for counsel, among them petitioner but none was provided," and that "petitioner sought counsel and assistance throughout." Montes also alleged in that memorandum that he was questioned at the police station concerning inconsistencies in his story prior to receiving any *Miranda* warnings. The district court examined the record of the state court suppression hearing and found no evidence that these allegations were true; our examination of that record confirms that finding. Although Montes apparently does not continue to urge the truth of these allegations before this Court, we find that the state suppression hearing was both full and fair, that it supports the conclusion that Montes' *Miranda* rights were not infringed, and that, accordingly, Montes is not entitled to an evidentiary hearing in federal court on these issues. *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).